EASTERN DISTRICT OF CALIFORNIA

CARLOS R. AGUIRRE,
Plaintiff,



VS.

CASE NO. 2:12-CV-2165 KJN

COUNTY OF SACRAMENTO
sued in its official Capacity;
SHERIFF SCOTT JONES,
CAPT. JIM COOPER,
Lt. THOMAS ANDRIS,
SGT. JAMIN MARTINEZ,
SGT. MELVIN OANIA,
DEPUTY ROBERT PLACE,
DEPUTY JOSEPH KINDER, and
DOES 1-5, inclusive, sued in their
official and individual Capacities,
Defendants.

AMENDED COMPLAINT FOR
INJUNCTIVE RELIEF AND DAMAGES;
DEMAND FOR JURY TRIAL

# FILED

JAN - 3 2013

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

## INTRODUCTION

This is a civil rights action filed by, Carlos R. Aguirre, both a sentenced prisoner and a pre-trial detainee, for damages and injunctive relief under 42 U.S.C §§ 1983 and 1985, alleging deliberate indifference to his need for safety and deliberate indifference to his serious medical needs in violation of the Eighth and the Due Process Clause of the Fourteenth Amendments to the United States Constitution, in addition to, conspiracy to obstruct the due course of justice and deprivation of equal protection of the law in violation of the Equal Protection of the law clause of the Fourteenth Amendment and retaliation for free speech in violation of the First Amendment to the United States Constitution. The plaintiff also alleges the tort of negligence for failure to protect and general negligence resulting in injury under California State Law. Plaintiff will seek class certification at the appropriate time.

1

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C §§ 1331(1) and 1343 in that this is a civil action arising under the United States Constitution.

2. Supplemental jurisdiction of this Court is invoked pursuant to 28 U.S.C §1367 in that the plaintiff's state law claim of negligence arises from the same set of facts that give rise to this civil action.

EXHAUSTION OF ADMINISTRATIVE REMEDIES

3. The plaintiff has exhausted his administrative remedies with regard to all claims and all defendants, except for his retaliation claim against defendant Oania. This remedy was made unavailable to plaintiff due to his fear of further retaliation from defendant Oania in that defendant Oania had previously retaliated against plaintiff for his continuing to file grievances challenging a condition of confinement by threatening plaintiff with transfer to another facility, and would do so unless plaintiff wrote him a letter stating he no longer feared for his safety while attending court and ceased complaining in grievances about the issue of Protective Custody and general population inmates being mixed in the stairwells of the main jail courts. Therefore, plaintiff feared that if he filed a grievance against defendant Oania for retaliation, defendant Oania would then make good on his threat and have plaintiff transfered to RIO CONSUMNES CORRECTIONAL CENTER (RCCC). Under such circumstance and by such threat, exhaustion of administrative remedies with regard to plaintiff's claim of retaliation against defendant Oania was unavailable.

4. The plaintiff filed a notice of claim with the County of Sacramento Board of Supervisors within six months and brought suit within one year, as required by California state laws. The County of Sacramento has failed to settle his claim.

2

PARTIES

5. Plaintiff, Carlos A. Aguirre, is and was at all relevant times mentioned herein a protective custody (PC) inmate in the custody, control, and care of the Sacramento Sheriffs Department, hereinafter refered to as the SSD, and incarcerated at the Sacramento County Main Jail, hereinafter refered to as the SCMJ, and has at all times during his incarceration relied on the protection and care of the SSD. Plaintiff remains incarcerated at the SCMJ under the same conditions that give rise to this complaint.

6. Defendants Robert Place, Joseph Kinder, and defendants designated herein as Does 1 through 5, inclusive, are and at all times relevant herein employed by the SSD as sheriff's Deputies and assigned to the Court Security Division at the SCMJ. Plaintiff is informed and believes, and thereon alleges, that defendants Place, kinder, and Does 1 through 5 are properly trained Sheriff's Deputies who are and have been responsible for the safety, security, and over all well-being of all inmates at the SCMJ and, with special regard to, all inmates attending Court at the SCMJ. Their duties include, but not limited to, receiving, safely securing, and processing inmates through Court hearings, in addition to, adhereing to and/or enforcement of, protective custody (PC) and general population (GP) inmate segregation, PC inmate "escort" policies, investigation and reporting of inmate assaults and injuries, and ensuring any injured inmate receives or has the opportunity seek medical attention. Furthermore, as sworn officers of the law these defendants are under a duty to uphold the law and not impede or obstruct the due course of justice and to protect the rights of citizens. Moreover, under California state law, these defendants have a duty to provide reasonable care to protect those persons in their custody and care from assault by other inmates. The true names of said Does 1 through 5 are presently unknown to plaintiff, who therefore sues them by such fictitious names and will seek leave to amend this complaint to add their true names when they have been ascertained. Defendants Place, kinder, and Does 1 through 5, at all times mentioned herein were acting under color of state law, in the course and scope of their employment and are sued herein in their official and individual capacities.

7. Defendants Jamin Martinez and Melvin Oania are and at all times relevant herein employed by the SSD as sergeants and assigned to the Court Security Division at the SCMJ. Plaintiff is informed and believes, and thereon alleges, that defendants Martinez and Oania are properly trained Sheriff's Deputy Sergeants who are and have been

3

responsible for the safety, security and over all well-being of all inmates at the SCMJ and, with special regard to, all inmates attending court at the SCMJ. As Sergeants of the Court Security Division, they are responsible for promulgating, supervising the promulgation of, implementing, supervising the implementation of, monitoring compliance with, supervising the monitoring of compliance with, enforcing and supervising the enforcement of policies and procedures affecting the safety and security of all inmates at the SCMJ, with special regard to those inmates attending court at the SCMJ. Defendants Martinez and Oania's duties also include the reviewing of and responding to inmate grievances directed at their areas of responsibility and, as such, serve as the initial level of review of inmate grievances and appeals. At all times mentioned these defendants were and are acting under color of state law, in the course and scope of their employment and are sued herein in their official and individual capacities.

8. Defendant Thomas Andris is and at all times relevant herein was employed by the SSD as a Lieutenant and assigned to the Court Security Division as Assistant Commander thereof. Plaintiff is informed and believes, and thereon alleges that defendant Andris is a properly trained lieutenant who is and has been responsible for the safety, security, and over all well-being of all inmates at the SCMJ and, with special regard to, all inmates attending court at the SCMJ. As lieutenant and assistant commander of the Court Security Division he is responsible for promulgating, supervising the promulgation of, implementing, supervising the implementation of, monitoring compliance with, supervising the monitoring of compliance with, enforcing and supervising the enforcement of policies and procedures affecting the safety and security of all inmates at the SCMJ, with special regard to inmates attending court at the SCMJ. Defendant Andris' duties also include the reviewing of and responding to inmate grievances directed at his area of responsibility and, as such, serves as the second level of review of inmate grievances and appeals. At all times mentioned defendant Andris was and is acting under color of state law, in the course and scope of his employment and is sued herein in his official and individual capacities.

9. Defendant Jim Cooper is and at all times relevant herein was employed by the SSD as a Captain and assigned to the Court Security Division as Commander thereof. Plaintiff is informed and believes, and thereon alleges that defendant Cooper is a properly trained Captain who is and has been responsible for the safety, security, and over all well-being of all inmates at the SCMJ and, with special regard to,

4

all inmates attending court at the SCMJ. As Captain and Commander of the

Court Security Division he is responsible for promulgating, supervising the promulgation of, implementing, supervising the implementation of, monitoring compliance with, supervising the monitoring of compliance with, enforcing and supervising the enforcement of policies and procedures affecting the safety and security of all inmates at the SCMJ, with special regard to inmates attending court at the SCMJ. Defendant Cooper's duties also include the reviewing of and responding to inmate grievances directed at his areas of responsibility and, as such, serves as the third and final level of review of inmate grievances and appeals. At all times mentioned defendant Cooper was and is acting under color of state law, in the course and scope of his employment and is sued herein in his official and individual capacities.

10. Defendant Scott Jones is and at all times relevant herein was Sheriff of Sacramento County and Chief head of the SSD. Plaintiff is informed and believes, and thereon alleges, that defendant Jones is a properly trained Sheriff who is and has been responsible for all inmates at the SCMJ. As Sheriff of Sacramento County and chief head of the SSD he is responsible for promulgating, supervising the promulgation of, implementing, supervising the implementation of, monitoring compliance with, supervising the monitoring of compliance with, enforcing and supervising the enforcement of policies and procedures affecting the safety and security of all inmates at the SCMJ. Defendant Jones has policy-making authority for the SSD and the SCMJ, delegated to him by defendant County of Sacramento. At all times mentioned defendant Jones was and is acting under color of state law, in the course and scope of his employment and is sued herein in his official and individual capacities.

11. Defendant County of Sacramento is and at all times relevant herein has been responsible for all inmates in SSD custody at the SCMJ. Plaintiff is informed and believes, and thereon alleges, that defendant County of Sacramento is well informed of and has acknowledged the special need of protection for some of its prisoners. Defendant County of Sacramento has overall charge of the SSD and the SCMJ and is responsible for promulgating, supervising the promulgation of, implementing, supervising the implementation of, monitoring compliance with, supervising the monitoring of compliance with, enforcing and supervising the enforcement of policies and procedures affecting the safety and security of all inmates at the SCMJ. At all times mentioned defendant County of Sacramento was and is acting under color of state law, in

5

the course and scope of its employment and is herein sued in its official capacity.

12. Under California state law, all defendants, at all times relevant herein, are and were under a tort duty to provide plaintiff with reasonable care to protect him from assault by other inmates.

## Factual Statement

13. On, September 10, 2005, during a previous period of incarceration at the SCMJ, plaintiff renounced his gang affiliation and was subsequently classified as a "drop-out northerner" (ex-gang member) and further reclassified as a protective custody (PC) inmate in accordance and pursuant to Title 15, Article 5, Section 1050 of the California Code of Regulations and SSD operations order 4/02. Plaintiff has remained classified as such for all subsequent periods of incarceration, including his current detention, at the SCMJ.

14. On, March 22, 2012, at approximately 730am, plaintiff was summoned from his cell and upon checking in at the control tower he was instructed to put on a "PC-shirt" (a black-or-tan-colored t-shirt reserved for PC inmates and required when attending court for identification as such) and to get on an elevator for transport to the basement court holding area. Upon reaching the basement plaintiff and other PC inmates were placed in a holding tank reserved for PC inmates by defendant Place, Kinder, or one of Does 1-5 to await their court hearings.

15. At 1011am, inmate Robert Abayta, a general population (GP) inmate and known gang-member, was placed in the "A" stairwell along with

6

other GP inmates and knows gang members to await their court
hearings by either defendant Place, Kinder, or Does 1-5.

16. Shortly thereafter an unknown Deputy, which was either defendant
Place, Kinder, or one of the Doe defendants, unlocked and opened
the tank door in which plaintiff was waiting and instructed
plaintiff and two other PC inmates to proceed to stairwell "A",
ascend the stairwell, and enter the courtroom.

17. It is unclear to plaintiff which defendant, Place, Kinder, or
Does 1-5, placed inmate Abeyta in stairwell "A", however, prior
to plaintiff being taken out of the PC tank and being directed
to ascend the "A" stairwell all of these defendants were aware
of plaintiff's PC status and aware of inmate Abeyta's status as
a gang member and general population status and aware of his
presence and that of other GP inmates in the stairwell prior
to plaintiff being directed to ascend, and in utilizing county, policy, custom, or
practice of placing GP inmates in the stairwells, placed inmate Abeyta in said stairwell.

18. Additionally, every one of the defendants, through training, experience,
and SSD and SCMJ policies put in place to address such risks
and issues were and are aware of the violent tendencies and
propensities of gang members of the general population directed at
PC inmates, hence the need for protection and segregation from GP
inmates.

19. In utilizing their policy, custom, or practice of mixing PC and GP inmates in the stairwells, all
defendants disregarded this known risk and plaintiff was directed into the stairwell by either
defendant Place, Kinder, or Does 1-5.

20. Plaintiff, leading the trio of PC inmates, proceeded to ascend the
stairwell passing multiple GP inmates and upon reaching the top-most
landing where inmate Abeyta was sitting, inmate Abeyta suddenly
stood and violently assaulted unsuspecting plaintiff, striking him in
the face and sending him reeling backwards down the stairwell.

21. Fortunately, one of the other PC inmates ascending the stairwell

behind plaintiff reacted and intervened by putting out his hands and thereby halting plaintiff's backwards fall.

22. Due to this PC inmate's quick reaction and intervention, plaintiff narrowly escaped tumbling backwards down the stairwell and possibly dying.

23. Defendants Place and Kinder responded from the entrance to the stairwell and subdued inmate Abeyta.

24. Plaintiff and the other two PC inmates were then directed to descend the stairwell and proceed back to the PC holding tank.

25. Inmate Abeyta was placed in a seperate holding tank.

26. According to the inmate incident report later issued by defendant Place. and having done so only in response and to appease plaintiff after filing his initial grievance regarding the assault, at 10:15am defendant Place "... spoke to inmate Abeyta ..." and that inmate Abeyta told him " I can't be around those guys (PC inmates)".

27. The "(PC inmates)" in this statement was added by defendant Place and serves as further evidence of his knowledge that GP inmates, in accordance with gang politics, are mandated to assault PC inmates, So, when inmate Abeyta stated that he could not be "... around those guys," defendant Place knew he was refering to PC inmates and as such Supplemented inmate Abeyta's statement with "(PC inmates)".

28. Shortly thereafter plaintiff was once again summoned from the PC holding tank by either defendants Place, Kinder, or Does 1-5, and was directed to proceed to and ascend stairwell "A".

29. While proceeding to the stairwell plaintiff passed by defendant Kinder and one or all of defendants Does who were all facing plaintiff and who were all aware of plaintiff having been assaulted yet neither defendant to any steps to nor even ask plaintiff if he

8

was okay, injured or needed medical attention despite an obvious bloody laceration to the outside of plaintiff's lip.

30. These defendants did not take any steps to ensure nor at least make available medical attention to plaintiff nor took any steps to investigate or determine why inmate Abeyta assaulted plaintiff.

31. Based on their knowledge, experience, and training, these defendants were aware that inmate Abeyta, a gang member and GP inmate, assaulted plaintiff for the sole reason of his PC status and, therefore, took no steps to ascertain the cause of the assault.

32. Upon arriving at the stairwell defendant Place asked plaintiff if inmate Abeyta was his "co-D" (co-defendant) or if plaintiff knew him to which plaintiff replied "no".

33. Defendant Place then directed plaintiff to ascend the stairwell and enter the courtroom.

34. At this time, defendants Place, Kinder, and Does 1-5 were aware of the remaining GP inmates waiting in the stairwell, a total of about 8-10, and having been aware of the assault on plaintiff only minutes before by a member of general population waiting in said stairwell, disregarded, yet again, the known risk of harm to plaintiff and directed and/or allowed plaintiff to ascend the stairwell unescorted or without clearing the stairwell of GP inmates.

35. Plaintiff ascended the stairwell passing the remaining GP inmates, attended his hearing, descended the stairwell again passing multiple GP inmates and proceeded back to the holding tank fortunately without further incident.

36. While proceeding back to the holding tank plaintiff yet again passed by defendants Kinder and one or all of Does 1-5 and yet again none took steps to ensure or make available medical attention to plaintiff or at the very least inquire as to his well-being.

9

37. SSD and SCMJ policy dictates ensuring injured inmates or inmates being suspected of being injured receive medical attention or at the very least make available medical attention by inquiring into the inmates desire to seek such.

38. Furthermore, SSD and SCMJ policy dictates investigating and reporting of inmate assaults and injuries forthwith and such policies direct deputies to investigate inmate assaults by asking, but not limited to, assault victims three fundamental questions as follows: ① whether victim needs medical attention and, if so, promptly provide such, ② whether victim wishes to give a statement in regards to an assault upon his/her person, and ③ whether the victim wishes to prosecute the assaultant in criminal court. Instead, defendants Place, kinder, and Does 1-5 discussed the assault and their probable liability and agreed not to investigate or report the assault or issue disciplinary action against inmate Abeyta.

39. At all times following the assault on plaintiff, and having been aware of the assault, defendants kinder, Place, and Does 1-5 took no steps to investigate the assault as SSD and SCMJ policy dictates, or ensure and/or make available medical attention to the obviously injured plaintiff, as SSD and SCMJ also dictate.

40. Upon arriving back to the holding tank, the only inquiry made into plaintiff's well-being or injuries was defendant Place's question to plaintiff, "Are you alright?"

41. No other investigative or medical availability steps were taken to ensure plaintiff received justice for the unprovoked violent assault upon his person or to ensure he received medical attention for his obvious injuries at that time by any of defendants Place, kinder, or Does 1-5.

42. On the contrary, shortly after being back into the holding tank plaintiff began feeling moderate to severe pain to his mouth and jaw area and could taste blood. He could also feel a laceration on the outside and another one on the inside of his bottom lip. and since he could not see the injuries for himself he asked the other PC inmates in the tank with him to pass judgment on the seriousness of his injuries to which

they all concurred that plaintiff would require sutures to close both lacerations and so after drawing defendant Place's attention he approached and opened the tank door and plaintiff informed him that he was feeling pain, could feel lacerations to his lip, and that he wanted to see medical.

43. Defendant Place then looked at plaintiff's mouth area, then instructed him to "pull his lip down" and pronounced, "NO, (plaintiff didn't need medical attention) you're fine, but if you want I'll get you some ice in a little bit".

44. Plaintiff informed defendant Place that he did want ice for his injuries.

45. Having just been informed of plaintiff's wish to see medical and having examined plaintiffs injuries which revealed two lacerations, defendant Place disregarded plaintiff's serious medical need by stating, "NO, you're fine...", and not ensuring plaintiff received the requested medical attention, but instead down-played plaintiffs injuries and attempted to appease him by promising some ice.

46. After a while, maybe 20-30 minutes, defendant Place had not returned with the ice so plaintiff waived to defendant Doe 1 who approached and opened the tank door and plaintiff informed him of defendant Place's promised ice for his injuries to which this defendant replied that he would, ".. look into it".

47. This defendant, Doe 1, having been aware of the assault on plaintiff as he was present in the Court holding area at the time of the assault and having just spoken with plaintiff in close proximity, a distance of no more than a foot, could not have failed to see plaintiffs bloody and lacerated lip, and yet failed to ask and/or ascertain whether plaintiff need medical attention.

48. Furthermore, plaintiff's inquiry into Defendant Place's promise of ice for his injury to which defendant Doe 1 replied that he would "look into it" would have ensured his knowledge of plaintiff's injuries.

11

49. A short time later, defendant Place returned with some ice in a latex glove, which in itself, is evidence of defendant Place's knowledge of plaintiff's injuries.

50. The other PC inmates in the holding tank with plaintiff that observed and overheard defendant Place's conversation with plaintiff regarding his injuries insisted that defendant Place's conclusion of plaintiff's injuries when he responded to plaintiff, "No, you're fine...," after being informed of plaintiff's wish to see medical was "wrong" because it was obvious to all that plaintiff had not only a laceration on the inside of his lip but a larger one which was bleeding on the outside of his bottom lip which required sutures to close up and that plaintiff should insist on seeing medical.

51. It is common knowledge throughout the jail's population of inmates as being such informed and instructed by the deputies assigned to court security/court holding area not to disturb or otherwise "piss-off" the deputies because they will, as punishment, make inmates wait in the holding tanks longer after being done with court before allowing inmates to return to their housing units. Most often than not, any comment or question, such as, "we're done (with court) can we go back (to housing units)?" will trigger this response from the deputies and they will then "punish" not only the individual who asked or "bugged them" but the whole tank of inmates by making them wait longer before allowing them to return to their housing units.

52. Because of this knowledge and possible risk, plaintiff did not want to anger, "piss-off" or otherwise "bug" defendants Place, Kinder, or Does 1-5 by insisting on seeing medical and end up having to wait in the tank longer which would have "pissed-off" the other PC inmates with him and so plaintiff decided it would be best to wait until he returned to his housing unit before asking, again, for medical attention.

53. Upon returning to his housing unit plaintiff examined his injuries in the cell mirror which revealed the lacerations.

12

54. Plaintiff then informed the floor officer, through the cell intercom of his medical need and was told to standby.

55. A short while later plaintiff was summoned from his cell and instructed to see the nurse standing by the control tower who examined plaintiff's mouth, lip, and jaw area and concluded that, "It looks like you have a 'through and through'. I'll let the doctor know once I get back to the medical floor."

56. Plaintiff was then instructed to proceed back to his cell and await summons from the doctor.

57. Some time later plaintiff was summoned from his cell and instructed to get on an elevator for transport to the medical floor.

58. Upon arriving at the medical check-in desk he was directed to an examination room where a Dr. Nugget examined his injuries and also concluded that plaintiff had a "Through and through", in that, plaintiff's top tooth had punctured the outside of his bottom lip and exited on the inside, hence a 'through and through and that the lacerations would require sutures.

59. Dr. Nugget performed the suturing, administering three sutures to the laceration on the outside and one suture to the laceration on the inside of plaintiff's bottom lip. Dr. Nugget informed plaintiff that the sutures were self-dissolving and would do so in about four days, and also gave him a tetanus shot to help ward off infection.

60. Plaintiff was then medically cleared and returned to his housing unit.

61. Plaintiff experienced severe pain and his mouth and jaw area continued to throb with pain for the remainder of the day and well into the night and was unable to eat his dinner that day due to the pain experienced when attempting to chew or even talk as the movement required to move his jaw to eat or speak elicited pain.

62. The swollenness of plaintiff's lip and the tenderness of the left side jaw area

13

made sleeping painful and uncomfortable.

63. The sutured wounds, their tenderness and swollenness made eating a slow, delicate, and painful process for plaintiff, especially so as the lacerations began to heal at which time they transformed in canker-like sores and became extremely sensitive to even the slightest touch or friction which further made eating or talking very painful.

64. Plaintiff experienced these symptoms and pain for about two weeks.

65. The sutures did not dissolve after four days as expected and remained in place a few days longer after which time their failure to dissolve prompted the medical department to have a nurse remove the sutures which further caused plaintiff pain as the area was still sensitive and was not anesthesized prior to extraction of the sutures.

66. The outer laceration left a small but noticeable scar on plaintiff's bottom lip which further caused plaintiff emotional injury due to the insecurity he experiences from it.

67. The inner laceration left a lump of scar tissue that protrudes from plaintiff's bottom lip which continuously makes eating a delicate process in that if plaintiff doesn't take extreme care when eating and chewing his food, more so than before he had such protrusion of scar tissue, he inadvertently bites down on the scar tissue which causes him additional pain. Such condition is continuous.

68. Plaintiff continues to experience further emotional injury brought on by the violent and unprovoked physical assault upon his person and experiences anxiety and stress as scheduled court dates approach since he will have to ascend the same stairwell and does not know whether it will be cleared of GP inmates since jail officials and the County of Sacramento have refused to halt their custom of mixing PC and GP inmates in said stairwells despite their knowledge of and the obvious risk of substantial harm posed to plaintiff and all PC inmates as evidenced by the assault on plaintiff on March 22, 2012 and despite plaintiff's grievances challenging

14

69. Plaintiff experiences further anxiety and feelings of unease as he thinks about what could have happened to him or what other injuries he would have sustained had the PC inmate not been there to literally catch him and halt his backwards fall down the stairwell and the realization that he could have suffered a life-threatening injury or even death itself causes plaintiff severe anxiety.

70. Plaintiff also experiences episodes of climacophobia (fear of falling down stairs) in addition to episodes of off-balanceness and/or vertigo as if he is leaning too far backwards when ascending stairs even though in reality he is leaning forward.

71. The most severe anxiety plaintiff experiences is when he is attempting to fall asleep in that just as he is about to fall asleep he dreams and/or feels himself falling backwards and wakes with a start, has an elevated heart rate, and shortness of breath. These symptoms are continuous and almost nightly, so much so that plaintiff has been receiving psychiatric care and has been prescribed anti-anxiety medication.

72. Plaintiff also periodically gets a ringing in his ear, the same ringing he experienced after being assaulted by inmate Abeyta.

73. Plaintiff's psychiatrist refered him to medical department to have his ear checked stating that, "Sometimes, when you suffer a head injury, either by accident or being struck in an assault, the force by which you are struck could jar loose those tiny stones in your ear which could cause the ringing."

74. Plaintiff was examined by a nurse who found nothing medically wrong with plaintiff's ear that would be causing the ringing.

75. Plaintiff's psychiatrist attributes the ringing in his ear as a symptom of his anxiety caused by the assault upon him.

76. Although plaintiff experiences these emotional and psychological symptoms in episodic fashion, except for the wakeful starts which he experiences and suffers through almost every night, they are continuous and persistent and more so upon approaching scheduled court hearings and especially so when ascending the stairwell in which he was assaulted which he has had to do on numerous occassions since the stairwell is the only means by which to reach the courtroom.

77. Plaintiff has received and continues to receive psychiatric care and has been prescribed psychiatric medication to help him cope with his emotional and psychological injuries which are as a direct result of the violent and unprovoked physical assault upon his person.

78. From the time of the assault to the time plaintiff was allowed to return to his housing unit, at no time in between did any of defendants Place, Kinder, or Does 1-5 take steps to investigate inmate Abeyta's assault on plaintiff nor ask plaintiff if he desired to give a statement, press charges against inmate Abeyta for assault, or needed to see medical, as SSD and SCMJ policy directs deputies to do following an inmate assault and/or injury.

79. Furthermore, contrary to SSD, SCMJ, and County of Sacramento policies, defendants, Place, Kinder, and Does 1-5 failed to report the assault on plaintiff.

80. The failure of defendants Place, Kinder, and Does 1-5 to report the assault was done intentionally, by inaction in properly and procedurally investigating and documenting of the assault, and by agreement between these defendants (Place, Kinder, and Does 1-5) not to report and/or document the assault so as to keep the assault from becoming formally acknowledged and thereby escaping liability either administratively and/or civilly.

81. The assault on plaintiff was not reported until March 29, 2012, one week after it's occurrance, by defendant Place, and was done so only AFTER and in response to plaintiff's initial grievance regarding the assault, as the cat was out of the bag so to speak, and must now be reported.

16

82. The day after the assault on plaintiff March 23, 2010 he filed his initial grievance regarding the incident and requested immediate attention and action and substantiated his need for immediate attention by asserting that the issue being grieved, in addition to the assault having been made possible and proximately caused by the willful and blatent disregard of his need for safety and protection by jail officials and the County, but that of the unsafe custom, practice, and/or policy that the County of Sacramento, SSD and SCMJ had adopted, created, and/or promulgated whereby GP inmates being directed to wait in the stairwells and thereafter PC inmates being directed into the same stairwells without an deputy escort (contrary to SSD and SCMJ policies) and where no protective barrier existed between the two populations (contrary to SSD and SCMJ policies of PC and GP inmate segregation) posed a substantial risk of harm to plaintiff and all PC inmates as was evident by the violent assault on plaintiff by a GP inmate and, therefore, such custom, practice, and/or policy needed to be halted or the stairwells needed to be cleared of GP inmates prior to PC inmates being directed into them.

83. Plaintiff further asserted that the SSD and all jail officials were and are aware of the constant and long-standing threat of assault and violence posed by GP inmates to PC inmates, hence the need for protective custody, and due to their knowledge of such risks of harm, PC inmates shouldn't be mixed with GP inmates, which is contrary to written SSD and SCMJ policies in the first instance, and especially so in such a dangerous place as a stairwell where the propensity for sustaining a grievous injury, or even death, is extremely elevated and likely.

84. Plaintiff also asserted that because PC inmates attend court hearings every day of the work week the issue of mixing PC and GP inmates needed to be resolved immediately in order to avoid unnecessarily exposing PC inmates to threat of violence and assault by GP inmates.

85. plaintiff further asserted his need for safety and protection stating that as an ex-gang member and placed in protective custody by the SSD for that reason, as the SSD has acknowledged his need for protection and the constant

threat of assault and violence posed by GP inmates he would always be
targeted for assault and violence by GP inmates who adhere and are
governed by strict "prison politics" and regulations, one such "rule"
mandating the assault of any and all PC inmates.

86. Plaintiff further asserted and asserts now in his complaint that the "rule"
mandating PC inmate assault by GP inmates was not or is unheard of,
on the contrary, it is long-standing, well-grounded, and established in
fact and prevelant throughout all correctional institutions and the SSD's
and the County of Sacramento's knowledge of such threat and/or risk of
substantial harm to PC inmates but yet willfully and blatantly disregarding
that risk and PC inmates safety by mixing PC and GP inmates in the
stairwells amounts to a constitutional violation of his and all PC
inmates' rights and requires immediate correction.

87. By April 6, 2012, 15 days had lapsed since plaintiff filed his initial
grievance and he still had not received the attention requested nor any response
whatsoever so he filed a second grievance asserting the lack of response to the
first and again requesting immediate attention stating his issue being of
extreme importance.

88. By this time plaintiff began experiencing extreme anxiety, mental stress, and
fear due to the fact that he had an approaching court hearing less than six
days away, April 12, 2012, and his grievance had not been responded to and
his issue addressed and he feared being exposed to further assault when he
presented himself for court, a date fast approaching.

89. Three more days passed without plaintiff receiving any sort of response to any
of his grievances so he lodged a citizen's complaint with the SSD's Internal
Affairs Division in which he asserted the same facts as in his grievances
and the lack of response thereof, in addition to, detailing the disregarding
of his and all PC inmates' safety and protection and the unnecessary
exposure to substantial risk of harm he and all PC inmates were being
subjected to by deputies of the Court security division and the SSD.
He mailed the completed complaint on April 9, 2012.

90. On April 11, 2012, the eve of plaintiff's next court hearing and 19 days since he filed his initial grievance, Lt. Petersen of the SSD finally appeared to speak with plaintiff in response to his grievances.

91. During their conversation plaintiff clearly explained why and how he was assaulted, the sole reason of his being a PC inmate as the "why" and the assault having been made possible by the County of Sacramento's and the SSD's custom, practice, policy and/or de facto policy of mixing PC and GP inmates in the stairwells of the SCMJ as the "how" and further asserted and reiterated his and all PC inmates need for safety and protection.

92. Plaintiff also stated that he (Lt. Petersen) and all jail officials and the SSD are aware of the GP inmates' threat to PC inmates and to plaintiff and of their "rule" mandating PC inmate assault to which Lt. Petersen acknowledged.

93. Plaintiff further challenged the long delay in Lt. Petersen's response to his grievances, stating that his grievances should have been addressed immediately or, at the very least, much sooner since the issues raised involved inmate safety and/or the lack thereof.

94. Lt. Petersen acknowledged plaintiff's and all PC inmates' need for safety and protection, in addition to, acknowledging his and the SSD awareness of the long-standing GP inmate "rule" and "prison politics" mandating PC inmate assault and the constant threat of violence he and all PC inmates were under and posed by GP inmates.

95. Lt. Petersen also acknowledged the need for the stairwells to be cleared of GP inmates prior to PC inmates being directed into them and stated that as soon as he was done speaking with plaintiff he was going to proceed directly to the basement court holding area and instruct the Court Security Division deputies of the need and importance of clearing the stairwells of GP inmates prior to directing PC inmates into them or, at the very least, to provide PC inmates with a deputy escort when ascending the stairwells in the presence of GP inmates.

19

96. Lt. Petersen then informed plaintiff that the delay in responding to his grievances, a delay of 19 days, was experienced due to the "matter" having been forwarded to the "Courts" (Court Security Division) and also stated that the "appropriate documentation occurred", referring to the inmate incident report issued by defendant Place on March 29, 2012, one week AFTER the assault on plaintiff and AFTER plaintiff filed his grievance and done so in the interim of plaintiff's first grievance and the appearance of Lt. Petersen to speak with plaintiff in response to the grievances.

97. Upon receiving and reviewing plaintiff's grievances, Lt. Petersen then began his inquiry into the assault on plaintiff by contacting defendant Place and inquiring into the matter and after having become informed that no inmate incident report had been issued, as SSP and SCMJ procedure and policy dictate, Lt. Petersen then instructed defendant Place to issue an inmate incident report and postponed his response to plaintiff's grievances until such time that the incident report was issued, the disciplinary hearing held, and inmate Abeyta being disciplined as a result of his assault on plaintiff and not until all this was completed did Lt. Petersen appear to speak with plaintiff in response to his grievances which occurred April 11, 2012, 19 days after plaintiff filed his initial grievance.

98. In referring to the inmate incident report Lt. Petersen told plaintiff, "you declined to give a statement, or to prosecute and initially you declined medical attention...", all of which plaintiff disputed by informing Lt. Petersen that that information is not only incorrect but completely false because he was never interviewed nor given the opportunity or asked if he desired to give a statement or prosecute inmate Abeyta or asked if he needed medical attention.

99. Plaintiff then informed Lt. Petersen that he did in fact wish to prosecute the inmate who assaulted him and told Lt. Petersen that he didn't understand why he (Lt. Petersen) was addressing his grievances since he, as Lt. Petersen had asserted, that the "matter" had been forwarded to the "Courts", then why wasn't someone from the Court Security Division addressing him.

20

100. Lt. Petersen responded by telling plaintiff that if he wanted to press criminal charges against inmate Abeyta he would have to inform the deputies "involved" and further stated that he was addressing plaintiff's grievances because the matter initially came to his attention.

101. Plaintiff then asked Lt. Petersen to inform defendant Place of his wish to press criminal charges against inmate Abeyta and further reiterated his and all PC inmates' need to have the stairwells cleared of GP inmates because just having a deputy escort did not ensure their safety since any GP inmate could at any time commence an assault no matter if there is a deputy escort and therefore such measure was inadequate in ensuring his safety and protection, to which, Lt. Petersen replied that he would "let deputy Place know..." and that he "would see what I can do" about clearing the stairwells of GP inmates but at the very least would direct and ensure that PC inmates be escorted.

102. Later that same day plaintiff was summoned from his cell and instructed to approach the Control tower where a deputy handed him a document and stated, "That's from the Lieutenant (Lt. Petersen)."

103. Plaintiff returned to his cell and was astonished from the fact that he had been provided with a copy of the inmate incident report issued by defendant Place against inmate Abeyta for assaulting plaintiff, in that, it was unheard of for inmates to be made privy of, much less be provided with other inmates' disciplinary write-ups and proceedings.

104. Plaintiff was provided with the incident report for the sole purpose of appeasing him and/or showing or proving something had been done to discipline inmate Abeyta.

105. Plaintiff read the incident report in its entirety and immediately identified several inconsistencies and falsehoods.

106. According to the inmate incident report, authored by defendant Place, defendant Place indicated that plaintiff declined to give a statement, declined medical attention, and declined to prosecute inmate Abeyta, none of which

21

is correct but is entirely false because plaintiff was never interviewed, given the opportunity nor asked if he wished to give a statement, or to prosecute Inmate Abeyta or if he needed medical attention, on the contrary, and as asserted in paragraphs 42 and 43 of this complaint, plaintiff did in fact make known his need to seek medical attention to defendant Place who responded by, first, examining plaintiff's injuries and, after doing so, declaring, "No, you're fine..."

106. Additionally, in the "hearing" portion of the incident report plaintiff read the statement indicated by Sgt. Miller which read that, "On 3-29-12 (at approx. 1700 hours) I received a phone call from Deputy Place at the Main Jail. He informed me he had just completed a write-up for an assault which occurred at the MJ (main jail)".

107. The assault on plaintiff occurred on March 22, 2012.

108. Plaintiff filed his initial grievance on March 23, 2012.

109. Lt. Petersen didn't appear to speak with plaintiff in response to his grievances until April 11, 2012, and didn't do so until, first, instructing defendant Place to issue the incident report and only then after his instruction was carried out and the disciplinary hearing held against Inmate Abeyta did he appear to speak with plaintiff informing him that "... the appropriate documentation occurred.

110. The inmate incident report was never intended to be issued because defendants Place, kinder, and Does 1-5 agreed not to issue said report so as to keep the assault from becoming formally acknowledged and documented, in their attempt and conspiracy in escaping liability.

111. When defendant Place responded with, "No, you're fine..." to plaintiff's informing him that he should see medical for his injuries, defendant Place did so to keep plaintiff from actually seeking medical attention and having the assault and plaintiff's injuries acknowledged and documented.

112. Defendant Place disregarded plaintiff's injuries and his need to seek

and receive medical attention for those injuries, despite knowledge of plaintiff's injuries and his need to receive medical attention and did so in keeping with his and defendants' Kinder and Does 1-5 conspiracy to keep the assault and injuries from being formally acknowledged and thereby escaping liability.

113. The incident report further revealed Inmate Abeyta's statement to Sgt. Miller at the time of his disciplinary hearing in which Inmate Abeyta stated, "Not guilty. This happened on the 22nd (of March) and it's been too long for you to do the hearing".

114. Inmate Abeyta, acknowledging the delay in the issuance of the inmate incident report and disciplinary hearing against him attempted to avoid the disciplinary action against him by asserting that "... it's been too long for you to do the hearing.", a technicality he thought would benefit him in having the write-up dismissed, although it is unknown to plaintiff if inmate Abeyta appealed the guilty finding on that technicality or whether or not he succeeded, however, such acknowledgment and awareness of the delay proves that even inmate Abeyta didn't think he would be written up since he was not written up forthwith.

115. On April 12, 2012, plaintiff presented himself for his scheduled court hearing and again his safety and need for protection was disregarded in that he was directed into the stairwell "A" in which GP inmates were present, further exposing him to substantial risk of harm but, fortunately, he was not assaulted although he was in deep fear for his safety and suffered extreme anxiety and mental stress as he passed multiple GP inmates anticipating an assault or not knowing if he would be struck at any time.

116. While back in the holding tank and waiting to return to his housing unit plaintiff continuously looked out the tank door window in search of defendant Place but was unable to see or locate him so he informed a deputy, who may or may not be a Doe defendant in this matter, that he needed to speak with defendant Place in regards to the assault in the stairwell and the deputy told plaintiff that he would "let him (defendant Place) know".

23

117. Plaintiff wanted and needed to speak with defendant Place to convey his wish to prosecute inmate Abeyta.

118. Plaintiff awaited the appearance of defendant Place but he did not show up and plaintiff was later returned to his housing unit.

119. That evening, plaintiff wrote a letter to Lt. Petersen informing him that his safety and need for protection had once again been disregarded the day before when he presented himself for Court in that the stairwell had not been cleared of GP inmates prior to plaintiff being directed into it and that he did not appreciate his need for safety being disregarded especially in light of the previous assault upon his person by a GP inmate in that stairwell.

120. Plaintiff also addressed and raised the inconsistencies and falsehoods contained in the incident report issued by defendant Place and requested appropriate inquiries be made into the false information and further requested inquiries be made into the actions and/or inactions of defendants Place, Kinder, and Does 1-5, that of which being their intentional failure to follow procedure and policy in investigating and issuing the appropriate reports and/or documentation forthwith following the assault on plaintiff and their conspiracy, in attempting to escape liability, of keeping the assault from become formally acknowledged by discussion and agreement between defendants Place, Kinder, and Does 1-5.

121. Plaintiff also, once again, expressed his wish to prosecute inmate Abeyta.

122. Lt. Petersen never responded to plaintiff's written communication

123. On April 16, 2012, plaintiff was summoned to the first floor of the main jail to speak with defendant Martinez and upon approaching defendant Martinez, plaintiff noticed he had a copy of plaintiff's citizen's complaint and asked defendant Martinez if he was there to speak with him about it, to which, defendant Martinez replied, " I'm here to talk about the whole thing".

124. During their conversation plaintiff, yet again, expressed his and all PC inmates' need for safety and protection, pointing out the long-standing

24

GP inmate "rule" mandating PC inmate assault as reason enough to keep PC and GP inmates segregated, which is County, SSD and SCMJ policy in the first instance, and offered his recent assault by a GP inmate as further proof of his and all PC inmates' need for safety and protection.

125. Plaintiff also informed defendant Martinez of his wish to press charges for assault against inmate Abeyta.

126. Defendant Martinez acknowledged being aware of the GP "rule" and GP "prison politics" mandating PC inmate assault but commented that plaintiff should "... just deal with it ..." and "... don't come to jail then..", to which, plaintiff responded that just because he was in jail didn't give others the right to assault him or for those responsible for his safety and protection to disregard it, especially when they (County of Sacramento, SSD.) owed him a duty to protect him as he is a protective custody inmate.

127. Defendant Martinez then told plaintiff that if he wanted to press charges against inmate Abeyta he needed to so inform the deputies involved and plaintiff then told him that he had been trying to convey his wish to prosecute but that he was unable to communicate with defendant Place and that Lt. Petersen had not responded to his letter in which he stated as much.

128. Defendant Martinez then informed plaintiff that defendant Place was "off" but that once he was back he would let defendant Place know that plaintiff wanted to press charges against inmate Abeyta.

129. On April 2, 2012, defendant Martinez responded to plaintiff's initial grievance dated 3-23-12 of which Lt. Petersen also responded to although plaintiff did not receive defendant Martinez's response until after Lt. Petersen's response on 4-11-12.

130. Defendant Martinez only responded to the grievance by stating, "This incident was observed by deputies ... " and made reference to the inmate incident report but failed to take any steps to halt the

25

the mixing of PC and GP inmates in the Dayrooms, a custom, practice, and/or policy created by and/or utilized by the County of Sacramento, SSD, SCMJ, and the Court Security Division of the SSD of which he is a supervisor of.

131. Defendant Martinez's knowledge of the substantial risk of harm posed to Plaintiff and all PC inmates based on his position as a Sergeant/Supervisor and by his own acknowledgment when he spoke to plaintiff on April 16, 2012, stating that he was aware of the GP "prison politics" and "rule" mandating PC inmate assault and yet despite this knowledge and his awareness of the recent assault on plaintiff by a GP inmate, failed to take steps to correct the obvious deficiency of protective measures for plaintiff and all PC inmates

132. In allowing and/or knowingly acquiescing in the continued mixing of PC and GP inmates defendant Martinez disregarded and continues to disregard plaintiffs and all PC inmates need for safety and protection.

133. On, April 20, 2012, Deputy Payne from the SSD appeared to speak with plaintiff seeking authorization of release of plaintiff's medical records and requested that plaintiff sign the authorization of release form.

134. Plaintiff asked Deputy Payne why she required such authorization and she said, "We need it for our own investigation in case you decide to sue the County."

135. Plaintiff then informed Deputy Payne that he was uncomfortable in signing the form and would not do so until he consulted with an attorney, and Deputy Payne then said, "Thats okay. I'll just indicate "Refused" on the form."

136. Plaintiff then informed Deputy Payne that he had been trying to communicate with defendant Place to convey his wish to press charges against inmate Abayta but that his requests to do so had gone unheeded and/or ignored and asked her if she would pass the information along to defendant Place, which she agreed to do.

26

137. Later that day defendant Place finally appeared to speak with plaintiff and plaintiff informed him of his wish to press charges against inmate Abcyta.

136. Defendant Place then said, " well, as of today (4-20-12) I'm going to indicate in the report that you decided to prosecute.", to which plaintiff responded by telling him that he didn't just make that desicion and that he had been trying to communicate with him to convey his wish to prosecute by informing Lt. Petersen, the deputy plaintiff spoke with on 4-12-12 and to defendant Martinez on 4-16-12.

139. Defendant Place then informed plaintiff that none of his requests to speak with him had been relayed to him.

140. Plaintiff then refered to the incident report issued by defendant Place and asked him why he had falsely indicated he had spoken with plaintiff shortly after the assault and that plaintiff had declined to give a statement, declined medical attention, and declined to prosecute since none of that information was true because he (defendant Place) had never interviewed him nor given the oppertunity to give a statement or to prosecute and that plaintiff never declined medical attention but that it was he (defendant Place) who, after examining plaintiff's injuries, told plaintiff he didn't need medical attention after plaintiff had informed him that he should seek medical attention.

141. At that point defendant Place became very defensive and stated, " well, I thought I asked you or thought someone else had and when I looked at your lip it didn't look serious."

142. Plaintiff then stated, " I had a hole going through my lip, how could it NOT look serious," to which defendant Place responded, " well, it looks healed now so what's the big deal?".

143. Plaintiff then responded by stating, " Thats not the point. The point is that the assault was made possible by you guys and I could've tumbled down the stairs and have gotten seriously hurt".

144. Defendant Place then said, "Well you didn't" to which plaintiff replied, "yeah, I didn't because someone else (another PC inmate) was behind to stop me from doing so, and you saw the video (of the assault) yourself so you saw me falling backwards into the other PC (inmate)".

145. Plaintiff then asked defendant Place why it took a whole week for him to issue the inmate incident report and he answered by telling plaintiff that he had "...completed one sooner but it must've gotten lost in the system".

146. Plaintiff then stated that he didn't believe that because he knew that the incident report was never intended to be issued and pointed out as proof stating," That's why you indicated that I declined to give a statement because it was easier to do that than to fabricate a statement and say I gave it and you only then issued the write-up because I filed my grievances".

147. Plaintiff then referred back to the incident report pointing out Sgt. Miller's notation in the "hearing" portion of the write-up in which he stated that on 3-29-12 he received a phone call from defendant Place informing him that defendant Place had "...just completed..." the write-up and therefore plaintiff didn't believe defendant Place's assertion that he had completed a report sooner but that "...it must've gotten lost in the system".

148. At that point defendant Place became aggitated and stated, "The lieutenant (Lt. Petersen) didn't have to give you a copy of the write-up, he did you a favor by giving it to you", and further adds, "Is that all, because I gotta get back down there (court holding area)", and plaintiff replied that that was all for now and defendant Place then said, "Alright, I'll submit the report but its up to the D.A.'s office whether they'll prosecute or not", and departs.

149. Since the filing of plaintiff's initial grievance he had been asking other PC inmates who had gone to court if the stairwells were being cleared of GP inmates and all informed him that GP inmates were not being cleared out of the stairwells prior to them (PC inmates) being directed into them.

150. Plaintiff then filed another grievance on April 21, 2012 asserting the same claims

28

and raising the same issues as in his prior grievances and further challenged the mixing of PC and GP inmates and reiterated his and all PC inmates' need for safety and protection.

151. Plaintiff also raised the issue of defendant Place, Kinder, and Does 1-5 conspiracy, to keep the assault on plaintiff from becoming formally acknowledged by agreement, inaction, and intentional failure to investigate and issue the appropriate documentation and requested inquiries be made into their conspiracy.

152. Plaintiff further requested that the video footage of the assault and of plaintiff's subsequent court appearances be saved onto a CD and addressed the grievance to Lt. Petersen and the jail commander.

153. Apparently, the grievance was forwarded to defendant Oania because on April 25, 2012, he appeared to speak with plaintiff.

154. During their conversation plaintiff clearly expressed his and all PC inmates' need for safety and protection and further reminded defendant Oania of the constant threat of harm and violence posed to himself and all PC inmates by GP inmates.

155. Defendant Oania acknowledged the threat of harm and violence posed to PC inmates by GP inmates and of having been aware of the GP "rule" mandating PC inmate assault.

156. Defendant Oania further went on to state that he had just been assigned to the Court Security Division and was "amazed" when he saw how security was ran with respect to GP inmates being directed to wait in the stairwells and that it "...is not a good system" and informed plaintiff that he was going to "look into" alternative methods of processing GP inmates through their court hearings without having them wait in the stairwells and that plaintiff had "...done right by bringing it to our attention".

157. Defendant Oania further stated that, "when the jail was built 20-some years ago, it wasn't anticipated the volume of inmates that would be coming through here and now with implementation of the realignment plan we are receiving

29

a lot more inmates" but that " inmates safety is paramount and it's my job to ensure that."

158. On, May 8, 2012, plaintiff received defendant Oania's response to his grievance dated, 4-21-12, documenting their conversation on April 25, 2012.

159. On, May 9, 2012, plaintiff filed another grievance asserting the same claims and requesting the same relief as in his previous grievances.

160. On, May 14, 2012, defendant Oania reappeared to speak with plaintiff regarding his most recent grievance (up to that point) and during their conversation defendant Oania informed plaintiff that he had tried to develop alternative methods of processing GP inmates through their court hearings without requiring them to wait in the stairwells and having PC inmates mix with them but that he found the task "not possible" due to "conflicting schedules of the judicial staff" and in keeping with the "judges' and court calendars' pace".

161. Plaintiff then stated that he didn't understand what the difficulty was because it couldn't take much more effort (by jail staff) to keep GP inmates in their designated holding tanks and to let them out when summoned by the court, to which, defendant Oania replied that having to "key the doors" (to holding tanks) and the additional time it takes a GP inmate to ascend the stairwell, rather than already being in it, creates delay in processing GP inmates through their hearings.

162. Plaintiff then stated, "So what you're telling me is that logistical concerns are being given higher priority than inmate safety", to which, defendant Oania replied, " unfortunately, that's the way it is...", and that, " ...without building a new facility there's just no way around it, but PC inmates will continue to be escorted from now on to ensure your safety".

163. plaintiff then once again asserted that having a deputy escort, although a step in the right direction and appreciated nonetheless, was not an adequate measure because having an escort did not "ensure" his and all PC inmates' safety because while ascending the stairwell any GP inmate could at any time commence an assault on any PC inmate who is ascending or descending and a deputy's mere presence does not act like a barrier since he/she would be either in

30

front or in back but PC inmates would still be accessable to GP inmates and exposed to risk of harm.

164. Plaintiff further pointed out that on the day he was assaulted there were several deputies present (defendants Place, Kinder, and some or all of Does 1-5); albiet at the entrance of the stairwell but present nonetheless and their presence did not stop or deter inmate Abeyta from assaulting him.

165. Plaintiff further pointed out that the GP "rule" mandating PC inmate assault was and is "on-sight", meaning there is no discretion and must be carried out no matter what, deputy escort or not, and that he (defendant Oania) and all jail officials and County of Sacramento are and were aware of such "rule" and, therefore, knew the risk of harm posed to plaintiff and all PC inmates and so long as GP and PC inmates are continued to be mixed in the stairwells, he and all PC inmates would be under constant and real threat of substantial harm.

166. Defendant Oania then stated, "I'm sorry, there's just no way around it", despite knowledge of the alternative use and availability of the court holding tanks.

167. Plaintiff then asked defendant Oania if he required additional signatures from other PC inmates to his grievances in order for his grievances to be treated and/or addressed as a "group grievance or petition", to which, defendant Oania replied that he did not but that plaintiff was free to acquire them if he wanted to but acknowledged that plaintiff's grievances concerned all PC inmates.

168. Plaintiff then requested access to all PC inmates to acquire signatures but defendant Oania informed him that he could not grant or authorize access to all PC inmates for that task so if plaintiff wanted to get additional signatures he could only get them from those PC inmates within his own housing unit.

169. Plaintiff then inquired as to what inquiries had been made into the conspiracy perpetrated by defendants Place, Kinder, and Does 1-5 and defendant Oania informed him that that issue had been forwarded to the "Professional Standards Division" of the SSD and that they would conduct their own investigation into the matter and administer any disciplinary action as they deemed necessary but that plaintiff was not and would not be made privy to that information because it was an "internal matter".

170. In failing to halt the custom, practice, or policy of mixing PC and GP inmates in the stairwells despite his knowledge of the substantial risk of harm posed to plaintiff and all PC inmates by such mixing and despite his knowledge of plaintiff's need for safety and protection from GP inmates, defendant Oania has and continues to disregard plaintiff's and all PC inmates' need for safety and protection in allowing and/or knowingly acquiescing in the continued mixing of PC and GP inmates.

171. The following day, May 15, 2012, defendant Oania reappeared to speak with plaintiff, informing him that since he kept filing grievances expressing fear for his safety (when attending court) he was going to have plaintiff transfered to the branch (RCCC) the next day.

172. Plaintiff then expressed his desire to remain housed at the main jail and pointing out that transfering him to the branch served no remedial purpose because due to his pending criminal case plaintiff would need to be transported back to the main jail for his court hearings and would still have to utilize the same stairwells to reach the courtroom and, therefore, his housing location made no difference and that it was not his current housing location (the main jail) that posed a safety threat and transfering him would not eliminate the threat to his safety by the continued mixing of PC and GP inmates.

173. Plaintiff further stated that he was not the only one whose safety was at risk and who feared for his safety (when attending court) because there were other PC inmates who shared his fear and concerns and who also wanted and needed the stairwells cleared of GP inmates and the halting of mixing PC and GP inmates and informed defendant Oania that although he, by his own admission, didn't require additional signatures from other PC inmates, plaintiff had acquired them anyway and stated that he (defendant Oania) couldn't possibly transfer them all, not that transfer solved the issue or eliminated the safety threat.

174. Defendant Oania then replied, "Well, they're not the ones filing grievances. I've only gotten them from you," to which, plaintiff replied he (defendant Oania) had told him that he didn't require additional signatures for his grievances to be treated or addressed as a "group grievance or petition" since he had acknowledged the issue concerned all PC inmates.

32

175. Defendant Oania then told plaintiff, "If you want to stay here (main jail) you need to write me a letter stating you no longer fear for your safety and stop grieving the same issue", and that, "...otherwise you'll be on the bus tomorrow".

176. Thus, defendant Oania presented plaintiff with an threatening ultimatum: Either write him the demanded letter stating plaintiff no longer feared for his safety and cease grieving the issue of PC and GP inmate mixing, or, be transfered to another facility.

177. Plaintiff then responded by asserting that he was being retaliated against (by defendant Oania) by being threatened with transfer for continuing to file grievances expressing fear for his safety and challenging the mixing of PC and GP inmates and reminded defendant Oania of his personal assurance through a previous grievance response that plaintiff would not be retaliated against for writing grievances.

178. Defendant Oania then replied, "you can file all the grievances you want but if you want to remain at the main jail you need to write me that letter and step raising that issue", and continued more forcefully with, "So do you want to stay or go because I don't have all day and I have to get back to classification to let them know whether to take you off the transfer list or not".

179. Plaintiff then informed defendant Oania that he prefered to remain at the main jail.

180. Defendant Oania then said, "well then write me that letter and give it to your floor officer (for delivery to defendant Oania) when you're done", and departs.

181. Plaintiff then proceeded to write the demanded letter in adherence to defendant Oania's ultimatum and delivered it to the floor officer for delivery to defendant Oania.

182. Plaintiff also completed another grievance and attatched the additional signatures he had previously acquired from those PC inmates within his housing unit.

183. Plaintiff also contemplated but eventually decided against filing a seperate grievance against defendant Oania for retaliation due to his fear and concern

of further retaliation from defendant Oania.

184. Plaintiff, having been retaliated against by defendant Oania, through defendant Oania's threat of having plaintiff transferred if he didn't write a letter to him stating he no longer feared for his safety and to cease grieving the same issue, feared that if he filed a grievance for defendant Oania's retaliatory conduct against plaintiff, defendant Oania would make good on his threat and have plaintiff transferred; therefore, plaintiff did not file the grievance against defendant Oania.

185. Having such been retaliated against and threatened, plaintiff's concern of future retaliation by defendant Oania was genuine and, therefore, his administrative remedies with regard to this issue were made unavailable to plaintiff.

186. The following day, May 16, 2012, defendant Oania reappeared to speak with plaintiff and having received plaintiff's letter, the letter defendant Oania demanded he write or be transferred, informed plaintiff that based on his compliance in writing the letter and stating he no longer feared for his safety, the decision was made not to transfer plaintiff.

187. At that point plaintiff handed defendant Oania the grievance with attatched signatures from other PC inmates he had completed the night before, hoping that defendant Oania would not then decide to transfer plaintiff for once again grieving the same issues, in that, having formally accepted a grievance with additional PC inmate signatures, defendant Oania would not be able to have them all transfered (plaintiff and those who signed the grievance, a total of twenty-four additional signatures).

188. Defendant Oania then stated, "Oh, come on, you're killing me.. another grievance.."

189. Plaintiff then went on to explain to defendant Oania that he was not just trying to "bug them" with continuous grievances but that he was required to exhaust his administrative remedies by the Prison Litigation Reform Act, of which defendant Oania expressed ignorance of, and plaintiff then provided defendant Oania with case law to that effect, which defendant Oania said he'll ".. have

34

190. Plaintiff, in his effort to comply with the PLRA's exhaustion requirement, continued to file grievances challenging the County of Sacramento's, SSD's, and SCMJ's, custom, practice, and/or policy of mixing GP and PC inmates in the stairwells and the willful disregard of his and all PC inmates' safety and protection by such mixing of the two populations in addition to asserting that the "deputy escort" procedure was and is inadequate in ensuring his and all PC inmates' safety and protection.

191. On June 8, 2012, plaintiff presented himself for a scheduled court hearing and was once again exposed to risk of substantial harm by being directed into a stairwell where multiple GP inmates were present.

192. Fearing for his safety, plaintiff had no choice but to comply with the deputy's orders and ascended the stairwell. Fortunately, plaintiff was not assaulted, although he suffered extreme anxiety and mental stress in anticipation of an assault.

193. On May 18, 2012, defendant Oania responded to plaintiff's grievance dated 5-15-12, and acknowledged receiving plaintiff's "petition", that being the additional PC inmate signatures he attached to the grievance, but failed and/or refused to halt the mixing of PC and GP inmates in the stairwells, disregarding plaintiff's and all PC inmates' need for safety and protection and segregation from GP inmates, despite his knowledge of the inherent risk of harm posed to plaintiff and all PC inmates by such mixing.

194. On June 12, 2012, defendant Andris responded to plaintiff's grievances stating that, "All of your grievances are regarding the same incident and have been answered thoroughly by Sergeant Oania".

195. Defendant Andris, having foreknowledge of the threat of violence and assault posed to PC inmates by GP inmates and having acknowledged plaintiff's grievances disregarded and continues to disregard plaintiff's and all PC inmates' need for safety and protection by failing and/or refusing to halt the custom, practice, and/or policy of the County of Sacramento, SSD, and the SCMJ of mixing PC and GP

35

inmates in the stairwells

196. Defendant Andris, as assistant commander of the Court Security Division, has the authority and ability to halt the unsafe mixing of PC and GP inmates, and despite his knowledge of the safety risks such mixing poses, fails and/or refuses to do so, continuously disregarding plaintiff's and all PC inmates' need for safety and protection.

197. On July 3, 2012, defendant Cooper responded to plaintiff's grievances stating that, " This most recent grievance is not asking for anything you have not already asked for and there is no additional information we can provide that has not already been provided to you".

198. Defendant Cooper as Captain and commander of the Court security Division, has the authority and ability to halt the unsafe mixing of PC and GP inmates, and despite his knowledge of the safety risks such mixing poses, fails and/or refuses to do so, continuously disregarding plaintiffs and all PC inmates' need for safety and protection.

199. Defendants Cooper and Andris, as high-level supervisors for the Court Security Division created and/or knowingly acquiesced in the custom or policy of mixing GP and PC inmates which proximately caused plaintiff's injuries.

200. Plaintiff has been housed at the main jail since April 2010 to the present and during all this time has made countless court appearances, every time having to utilize the basement stairwells to reach the courtrooms and every time having to pass by GP inmates waiting in those stairwells by direction of the SSD in blatant and willful disregard to the obvious risk of harm and to plaintiff's need for safety and protection.

201. Defendant Jones, as sheriff of Sacramento county and chief of the SSD has the authority and ability to halt the unsafe mixing of PC and GP inmates and despite his knowledge of the safety risks such mixing poses, allowed the mixing to continue, and continues to allow such mixing of PC and GP inmates in blatant and willfull disregard of plaintiffs and all PC inmates' safety and protection.

36

202. Defendant County of Sacramento approved the design and construction of the SCMJ and any and all inadequacies experienced in safely housing inmates, with special regard to the "Court holding area" are of its own construction.

203. The Court holding area consists of a hallway with multiple holding tanks along its length; eight total holding tanks.

204. Tanks #s 8 and 7 are reserved for PC inmates.

205. All other tanks are used for containing GP or punitive segregation inmates.

206. All tanks have a door which requires a key to open and only jail officials possess such keys.

207. The purpose for the construction of these tanks is to securely contain inmates while awaiting their court hearings and multiple tanks were put in place to allow jail officials to seperate and/or segregate different classes of inmates that need and/or require such segregation, as PC inmates do.

208. All defendants have, in choosing to bypass the use and security of these holding tanks by instead directing GP inmates to wait in an unsecure and dangerous location (stairwells), disregarded plaintiffs and all PC inmates need for safety when they directed plaintiff into said location where he was violently assaulted.

209. In choosing to continuously bypass the use and security of these holding tanks but instead directing GP inmates to wait in an unsafe and unsecure location (stairwells) and having done so for at least the past three years, all defendants have created a custom, practice, policy and/or de facto policy of the County of Sacramento, SSD and the SCMJ of unsafely mixing PC and GP inmates.

210. In choosing to continuously bypass the use and security of the holding tanks but instead directing GP inmates to wait in an unsecure and unsafe location (stairwells) and thereafter directing PC inmates into same location, and having done so for at least the past three years, all defendants have created a practice, custom, policy, and/or de facto policy of the County of Sacramento, SSD, and the SCMJ of unsafely mixing PC and GP inmates.

37

211. In choosing to bypass the use and security of the holding tanks but instead directing GP inmates to wait in an unsafe and unsecure location (stairwells) and thereafter directing PC inmates into same location, despite foreknowledge of the threat of violence and assault posed to PC inmates by GP inmates, and having mixed the two populations in said manner for at least the past three years, all defendants have created a custom, practice, policy and/or defacto policy of the County of Sacramento, SSD, and the SCMJ of deliberate indifference to PC inmates' need for safety and protection.

212. On, March 22, 2012, in choosing to bypass the use and security of the holding tanks but instead choosing to utilize their custom, practice, policy and/or defacto policy of mixing PC and GP inmates in the stairwells of the main jail and/or their knowledge that such custom, practice, policy, and/or defacto policy was being utilized, and having foreknowledge of the threat of violence and assault GP inmates pose to PC inmates, all defendants disregarded plaintiff's need for safety and protection which resulted in plaintiff being violently assaulted and sustaining injuries.

213. The County of Sacramento and the SSD had implemented measures to protect those inmates needing protection, plaintiff as one, by establishing a protective custody classification, protective custody "pods" or housing units, protective custody court holding tanks, protective custody T-shirts for PC inmates when attending court, deputy escorts for PC inmates, and segregation and total separation from GP inmates, but yet disregarded all such protective measures when they created the custom, practice, policy and or defacto policy of mixing PC and GP inmates in the stairwells, and continue to do so, stating logistical reasons and/or more efficient processing of inmates through their court hearings as reasons for such disregard to their own policies but also to PC inmate safety.

214. Prior to the assault on plaintiff on March 22, 2012, all defendants were aware of plaintiff's protective custody status and inmate Abeyta's status as a GP inmate and gang-member and all defendants disregarded the obvious risk of harm to plaintiff by inmate Abeyta by allowing the two inmates to come into contact.

38

215. Defendant Jones has worked at the main jail and had knowledge of the mixing of PC and GP inmates in the stairwells and despite the obvious risk of harm posed by such mixing of inmates and despite his knowledge of the GP "rule" mandating PC inmate assault, has allowed such mixing to occur in total disregard for plaintiff's and all PC inmate need for safety.

216. Plaintiff further notes that Deputy Smalley from the SSD, when receiving plaintiff's grievance dated 5-9-12, stated to plaintiff upon reading the grievance, "you're trying to change policy (challenging the mixing of PC and GP inmates) and you're not going to .. there's too much red tape".

217. All defendants have violated plaintiff's constitutional rights to be free from deliberate indifference to his personal need for safety and protection, and such violation resulted in him being violently assaulted and receiving injuries.

219. Defendants Place, Kinder, and Does 1-5 have violated plaintiff's constitutional rights to be free from deliberate indifference to his serious medical needs by depriving him of medical attention for his injuries.

220. Defendant Oania has violated plaintiff's constitutional rights by retaliating against him for filing grievances expressing fear for his safety.

221. Defendants Place, Kinder, and Does 1-5 have violated plaintiff's constitutional rights by conspiring to deprive him of equal protection of the law and did so for the sole purpose of attempting to escape liability for their negligent acts and disregard to plaintiff's need for safety resulting in his injuries.

222. Defendants Place, Kinder, and Does 1-5 owed plaintiff a duty of reasonable care to protect him from assault by other inmates, under state law, and breached that duty by disregarding all protective measures put in place by the County of Sacramento and the SSD to protect plaintiff which resulted in plaintiff being violently assaulted and receiving serious injuries.

223. The assault on plaintiff was captured on security footage and has been preserved onto a disk at plaintiff's request.

39

225. Defendant Oania, upon his initial meeting with Plaintiff on April 25, 2012 in response to plaintiffs grievances, acknowledged that the SSO's and the County of Sacramento's custom, practice, and/or policy of bypassing the use and security of the court holding tanks but rather directing GP inmates to wait in the stairwells " was not a good system..." and that he "was amazed." when he first saw how security was ran with regard to that issue.

226. Defendant Oania further acknowledged that plaintiff had " done good by bringing it to our attention" and that he was going to "look into alternative methods" of processing GP inmates through their court hearings.

227. After having done so defendant Oania reported back to plaintiff in person and in written response to plaintiffs grievances that he had found the task " not possible" because of the "conflicting schedules of the judicial staff" and the "fast pace of the Court processions" but that plaintiff and all PC inmates would be "escorted up and down the stairwell" in the future.

228. Plaintiff, realizing and knowing that having a deputy escort was inadequate in ensuring his safety and protection based on his knowledge, as a former GP and gang-member inmate, of the GP "rule" mandating PC inmate assault "on-sight" continued to file grievances challenging the continued mixing of PC and GP inmates, in addition to, defendant Oania's promise of an deputy escort as inadequate.

229. Defendant Oania, after determining that it was "not possible to clear the stairwell of GP inmates," and exasperated due to his unsuccessful attempts at appeasing and/or satisfying plaintiffs grievances decided to, and/or was instructed to, employ a different approach to plaintiffs grievances and that was to threaten plaintiff with transfer to another facility, if he didn't write him a letter stating he no longer feared for his safety and cease to grieving the same issue.

230. Thus, on May 15, 2012, defendant Oania presented plaintiff with his ultimatum, threatening plaintiff with transfer if he didn't write him the demanded letter and ceased to grieving the same issue

231. Furthermore, in demanding plaintiff to renounce his declared fear for his safety

by written communication and to cease grieving the same issue, both his genuine fear and issue being grieved having been formally recognized and acknowledged, as is evident by all the responses to plaintiff's grievances in addition to defendant Oania's own statements that the mixing of PC and GP inmates in the stairwells was "not a good system" and having been "amazed" when he first witnessed such custom or practice and his own unsuccessfull efforts to correct such shortcomings, defendant Oania displayed disregard for plaintiff's need for safety by demanding such renouncement of plaintiff's fear for his safety knowing that the continued utilization of such custom or practice by the SSD and the County of Sacramento posed a substantial risk of harm to plaintiff and all PC inmates and his failure and refusal to halt such custom of mixing PC and GP inmates despite the obvious risk and his own acknowledgement of such risk of harm to plaintiff and all PC inmates amounts to willful and blatant disregard for plaintiff's and all PC inmates' need for safety and protection.

232. Moreover, defendants Andris and Cooper, having reviewed and responded to all of plaintiff's grievances, acknowledged his fear for his safety posed by the mixing of PC and GP inmates and their acknowledgement of defendant Oania's responses to plaintiff's grievances, in addition to, acknowledging defendant Oania having "researched and determined it was not possible to clear the stairwell of GP inmates" despite their knowledge of the alternative use of the holding tanks to safely and securely contain GP inmates, for which sole purpose these tanks were constructed for, have disregarded plaintiff's and all PC inmates' need for safety and protection by allowing the continued mixing of PC and GP inmates in the stairwells and, having the authority, delegated to them by the County of Sacramento and defendant Jones, to halt such unsafe mixing of PC and GP inmates, have failed and/or refused to do so further endangering plaintiff's and all PC inmates safety and security.

233. Defendants County of Sacramento and Jones, having knowledge of plaintiff's stated fear for his safety by their custom and/or practice of mixing PC and GP inmates in the stairwells, due to formal acknowledgement of such stated fear by plaintiff by defendants Oania's, Andris', and Cooper's review and responses to plaintiff's grievances, two of which defendants are Commanders of the Court Security Division of the SSD and all of which are supervisory officials for the SSD, have disregarded plaintiff's and all PC inmates need for safety and protection by allowing the continued custom, practice, and/or policy of mixing GP

41

and PC inmates and their failure and refusal to halt such unsafe mixing of GP

and PC inmates despite their knowledge of the obvious risk of substantial harm to plaintiff and all PC inmates further endangers plaintiffs and all PC inmates' safety and security and continues to do so.

234. Defendant County of Sacramento has recognized and acknowledged the need for certain inmates to require protection and complete segregation from the General Population and due to such need and acknowledgement, the County of Sacramento and the SSD have implemented security and protective measures for those inmates which include establishing protective custody housing units, protective custody court holding tanks, protective custody identification T-shirts for PC inmates to wear when attending court, deputy escorts for PC inmates anytime there is possible PC to GP inmate contact, and complete segregation from GP inmates.

235. Defendant County of Sacramento and the SSD have provided training to its deputies in gang activity awareness, gang "rules" and "prison politics" all of which are inherent in the general population and all such deputies and jail personnel as well as the County of Sacramento are well aware of the safety threat GP inmates pose to PC inmates, hence the need for "protective custody" and complete segregation of PC and GP inmates.

236. One such class of inmates requiring protection and complete segregation from GP inmates are former gang-members, plaintiff as one, having been acknowledged and classified as such by defendant County of Sacramento, and the SSD.

237. One such class of inmates placed in the general population are active gang-members.

238. Defendant County of Sacramento and SSD, acknowledging plaintiff's status as a former gang-member, classified him as a protective custody inmate and placed him within the protective custody population.

239. Defendant County of Sacramento and the SSD, recognizing and acknowledging inmate Abeyta's status as an active gang-member, classified him as such and placed him within the general population.

240. All deputies who work at the main jail have access to all inmates.

42

housing and classification status.

241. On March 22, 2012, inmate Abeyta arrived at the court holding area of the SCMJ and was directed into, along with other GP inmates, a holding tank reserved for GP inmates and was directed as such by one of defendants Place, Kinder, or Does 1-5.

242. Upon receiving inmate Abeyta at the court holding area, defendants Place, Kinder, and Does 1-5 were aware of inmate Abeyta's status as a general population inmate and active gang-member.

243. On March 22, 2012, plaintiff, wearing the designated "PC-T-shirt", arrived at the court holding area and was placed into, along with other PC inmates, a holding tank reserved for PC inmates and was placed in such tank by one of defendants Place, Kinder, or Does 1-5.

244. Upon receiving plaintiff at the court holding area, defendants Place, Kinder, and Does 1-5 were aware of his status as a PC inmate.

245. Defendants Place, Kinder, and Does 1-5, in utilizing defendants County of Sacramento's and Jone's custom, practice, and/or policy of placing GP inmates in the stairwells, placed inmate Abeyta and other GP inmates in the stairwell "A" at 10:11am on March 22, 2012.

246. Defendants Place, Kinder, and Does 1-5, in utilizing defendants County of Sacramento and Jone's custom, practice, and/or policy of placing GP inmates in the stairwells, chose to disregard the safe and secure use of the holding tank by placing inmate Abeyta in an unsecure and unsafe location (stairwell).

247. Defendants Place, Kinder, and Does 1-5, knowing inmate Abeyta was in the stairwell, chose to disregard all protective measures, policies, and procedures already established, with special regard to GP and PC inmate segregation, deputy escort, and plaintiff's PC status, by utilizing defendants County of Sacramento's and Jone's custom, practice and/or policy of mixing GP and PC inmates in the stairwells and directed plaintiff into the stairwell where he was violently assaulted by inmate Abeyta.

248. Defendants County of Sacramento, Jones, Andris, and Cooper created and/or knowingly acquiesced in the creation of a custom, practice, and/or policy of mixing GP and PC inmates

43

in the stairwells and allowed and/or knowingly acquiesced in the utilization of such policy, custom, and/or practice by their deputies which resulted in and was the proximate cause of plaintiff's injuries.

249. All defendants created a policy, de facto policy, custom, and/or practice and/or knowingly acquiesced in the creation and utilization of such of disregarding their own policies, practices, and/or procedures designed and established to protect PC inmates from GP inmates by complete and total segregation of the two populations and have done so and continue to do so with willfully and with reckless or callous disregard for plaintiff's and all PC inmates federally protected rights.

250. Prior to the assault on plaintiff by inmate Abeyta all defendants, through their own policies, practices, procedures, and training, had specific knowledge of the inherent safety threat posed to PC inmates by GP inmates and, thereby, the safety threat posed by inmate Abeyta, a GP inmate and known gang member, to plaintiff, a PC inmate, and had knowledge of the obvious risk of substantial harm to plaintiff and all PC inmates by the mixing of PC and GP inmates and, especially so, in such and unsafe and dangerous place as a stairwell, and all defendants willfully and recklessly chose to and continue to disregard that risk and plaintiff's need for safety and protection.

251. All defendants, in utilizing a policy, custom, and/or practice of placing GP inmates in the stairwells created a dangerous condition by which plaintiff was assaulted and sustained injuries.

252. All defendants, in utilizing a policy, custom, and/or practice of placing GP inmates in the stairwells and utilizing the stairwells as a "holding area" for GP inmates, placed plaintiff in a position of danger he would not otherwise have faced and/or rendered him more vulnerable to an existing danger and such affirmative action by these defendants was a proximate cause of plaintiff's injuries.

253. All defendants, in utilizing a policy, custom, and/or practice of placing GP inmates in the stairwells and disregarding the safe and secure use of the holding tanks but instead choosing to utilize the stairwells as a "holding area", negligently misused County property which was a proximate cause of plaintiff's injuries.

44

Case 2:12-cv-02165-TLN-KJN Document 21 Filed 01/03/13 Page 48 of 50

254. Defendant County of Sacramento was negligent in maintaining a public premises in a dangerous condition, in that, defendant County of Sacramento's creation of a policy, custom, and/or practice of utilizing the stairwells as a "holding area" for GP inmates and/or it's knowing acquiescence in such utilization of a policy, custom, and/or practice, was a proximate cause of plaintiff's injuries as such negligence created and/or increased the reasonably foreseeable risk that criminal activity would injure plaintiff, a PC inmate, and/or created and/or increased the risk that plaintiff, a PC inmate, would be assaulted by a GP inmate.

255. In responding to plaintiff's grievances challenging the defendants' policy, custom, and/or practice of mixing PC and GP inmates by placing GP inmates in the stairwells and/or utilizing the stairwells as a "holding area" for GP inmates, defendant Oania stated to plaintiff that, "when the jail was built 20-some-year-ago it wasn't anticipated the volume of inmates that would be coming through here ...", and after researching and determining that it was "not possible" to clear the stairwells of GP inmates defendant Oania further stated that "...without building a new facility, there's just no way around it...", and as such defendant County of Sacramento has maintained and/or created a defective condition of property of which was a proximate cause of plaintiff's injuries.

256. All defendants owed plaintiff a duty to protect him from assault and all have breached that duty, resulting in and proximately causing plaintiff's injuries.

CLAIMS FOR RELIEF
A. Deliberate Indifference to Plaintiff's Need for Safety; Failure to Protect

257. Plaintiff refers to and incorporates by reference herein the allegations of paragraphs 5-34, 42, 53-77, 82-95, 115, 119, 123-132, 149-217, 223, 225-250, inclusive.

258. Defendant County of Sacramento acted with deliberate indifference to plaintiff's need for safety in violation of the Eighth and the Due Process Clause of the Fourteenth Amendments to the United States Constitution by creating a policy, de facto policy, custom or practice and/or knowingly acquiescing in the creation and/or utilization of a policy, de facto policy, custom, or practice of utilizing the stairwells of the main jail as "holding areas" for GP inmates and mixing PC and GP inmates that resulted in and was a proximate cause of the

45

violent and unprovoked assault on plaintiff, in which he received serious physical, emotional, and psychological injuries. Foreknowledge of the substantial risk of harm to plaintiff, a PC inmate, or to a class of inmates, PC inmates, based on defendant County of Sacramento's and the SSD's expertise, prior experience, training, and their own policies, procedures, and practices designed to address such risks put defendant County of Sacramento on sufficient notice of plaintiff's need for safety and of the substantial risk of harm posed to him and all PC inmates by the mixing of PC and GP inmates in the stairwells and, although contrary to defendant County of Sacramento's own written policy of PC and GP inmate segregation, its custom and/or practice of utilizing the stairwells as a "holding area" for GP inmates and of mixing PC and GP inmates has been so long-standing and grounded such that it constitutes a de facto policy of deliberate indifference to plaintiff's and all PC inmates' need for safety, in that, defendant County of Sacramento has willfully chosen to and/or knowingly acquiesced in the total and reckless disregard of its own policies and procedures (i.e. PC and GP inmate segregation and the use of specifically designed Court holding tanks for safely and securely containing GP inmates while awaiting their Court hearings) designed and implemented to protect and ensure PC inmate safety. Furthermore, defendant County of Sacramento's failure and/or refusal to end the mixing of PC and GP inmates and its failure and/or refusal to enforce PC and GP segregation policy despite its knowledge of the substantial risk of harm to plaintiff and all PC inmates, amounts to deliberate indifference of plaintiff's and all PC inmates' need for safety.

259. Defendant Scott Jones, as Sheriff of Sacramento County and policy-maker for the SSD created a policy, de facto policy, custom or practice and/or knowingly acquiesced in the creation of and/or utilization of a policy, de facto policy, custom or practice of utilizing the stairwells of the main jail as "holding areas" for GP inmates and of mixing PC and GP inmates in said stairwells which resulted in and was a proximate cause of the violent assault on plaintiff, a PC inmate, by a GP inmate, in which he received serious physical, emotional, and psychological injuries, and did so with deliberate indifference to plaintiff's need for safety, in violation of the Eighth and the Due Process Clause of the Fourteenth Amendments to the United States Constitution, in that, defendant Jones' foreknowledge of the safety threat posed by GP inmates to PC inmate and of the substantial risk of harm posed by the mixing of PC and GP inmates in the stairwells based on his training, expertise, prior experience, and on the SSD's and defendant

46

County of Sacramento's own policies, practices, and procedures designed to address

such risks put defendant Jones on sufficient notice of plaintiff's need for safety and of the substantial risk of harm posed to plaintiff and all PC inmates by the mixing of PC and GP inmates in the stairwells and, although contrary to SSD and defendant County of Sacramento's policy of PC and GP inmate segregation, his knowledge of and/or knowing acquiescence in the mixing of PC and GP inmates despite his knowledge of the substantial risk of harm posed to plaintiff and all PC inmates constitutes a defacto policy of the SSD and of defendant County of Sacramento of deliberate indifference to plaintiff's and all PC inmates' need for safety. Furthermore, defendant Jones' knowledge of and/or knowing acquiescence in the unconstitutional behavior of subordinates, his failure to train, supervise and his failure and/or refusal to end the hazardous and unconstitutional policy, custom, or practice of mixing PC and GP inmates in the stairwells establishes his liability.

260. Defendants Thomas Andris and Jim Cooper, as assistant commander and commander, respectively, of the SSD's Court Security Division, who also hold policy-making authority for the Court Security Division of the SSD, created a policy, defacto policy, custom or practice and/or knowingly acquiesced in the creation and/or utilization of a policy, defacto policy, custom or practice of utilizing the stairwells of the main jail as "holding areas" for GP inmates and of mixing GP and PC inmates in said stairwells, which resulted in and was a proximate cause of the violent assault on plaintiff, a PC inmate, by a GP inmate, in which he received serious physical, emotional, and psychological injuries, and did so with deliberate indifference to plaintiff's need for safety, in violation of the Eighth and the Due Process Clause of the Fourteenth Amendments to the United States Constitution, in that, defendant Andris' and Cooper's foreknowledge of the safety threat posed by GP inmates to PC inmates and of the substantial risk of harm posed by the mixing of PC and GP inmates in the stairwells, based on their training, expertise, prior experience, and on the SSD's and defendant County of Sacramento's own policies, practices, and procedures designed to address such risks put defendants Andris and Cooper on sufficient notice of plaintiff's need for safety and of the substantial risk of harm posed to plaintiff and all PC inmates by the mixing of PC and GP inmates in the stairwells and, although contrary to SSD and defendant County of Sacramento's policy of PC and GP inmate segregation, their knowledge of and/or knowing acquiescence in the mixing of PC and GP inmates despite their knowledge of the substantial risk of harm posed to plaintiff and all PC inmates constitutes a defacto policy of the

47

SSD and its defendant County of Sacramento's deliberate indifference to plaintiffs and all PC inmates' need for safety. Furthermore, defendant Andris' and Cooper's knowledge of and/or knowing acquiescence in the unconstitutional behavior of subordinates, their failure to train, supervise, and their failure and/or refusal to end the hazardous and unconstitutional policy, custom, or practice of mixing PC and GP inmates in the stairwells, establishes their liability.

261. Defendant Jamie Martinez created and/or knowingly acquiesced in the creation of and/or utilization of a policy, defacto policy, custom, or practice of utilizing the stairwells of the main jail as "holding areas" for GP inmates and of mixing PC and GP inmates in said stairwells, which resulted in and was a proximate cause of the violent assault on plaintiff, a PC inmate, by a GP inmate, in which he received serious physical, emotional, and psychological injuries, and did so with deliberate indifference to Plaintiff's need for safety, in violation of, the Eighth and the Due Process Clause of the Fourteenth Amendments to the United States Constitution, in that, defendant Martinez's foreknowledge of the safety threat posed by GP inmates to PC inmates and of the substantial risk of harm posed by the mixing of GP and PC inmates in the stairwells, based on his training, expertise, prior experience, and on the SSD's and defendant County of Sacramento's own policies, practices, and procedures designed to address such risks put defendant Martinez on sufficient notice of plaintiff's need for safety and of the substantial risk of harm posed to plaintiff and all PC inmates by the mixing of PC and GP inmates in the stairwells and, although contrary to SSD and defendant County of Sacramento policy of PC and GP inmate segregation, his knowledge of and/or knowing acquiescence in the mixing of GP and PC inmates, his failure to train, supervise, and his failure and/or refusal to end the hazardous and unconstitutional policy, custom, or practice of mixing PC and GP inmates, establishes his liability.

262. The actions of defendants Robert Place, Joseph Kinder, and Does 1-5, in utilizing a policy, defacto policy, custom, or practice of utilizing the stairwells in the main jail as "holding areas" for GP inmates and of mixing PC and GP inmates in said stairwells, resulted in and was a proximate cause of the violent assault on plaintiff, a PC inmate, by a GP inmate, in which he received serious physical, emotional, and psychological injuries, and such actions were perpetrated with deliberate indifference to plaintiff's need for safety, in violation of the Eighth and the Due Process Clause of the Fourteenth Amendments to the

48

, in that their foreknowledge of the safety threat posed to PC inmates by GP inmates and of the substantial risk of harm posed by the mixing of PC and GP inmates in the stairwells, based on their training, expertise, and from the SSD's and defendant County of Sacramento's own policies, practices, and procedures designed to address such risks put these defendants on sufficient notice of plaintiffs and all PC inmates' need for safety and of the substantial risk of harm posed to plaintiff by the mixing of PC and GP inmates in the stairwells and such knowledge establishes their liability.

263. Defendants County of Sacramento, Jones, Andris, Cooper, Martinez, Place, kinder, and Does 1-5, in doing as alleged hereinabove and in disregarding their own policies, practices, and procedures of PC and GP inmate Segregation (i.e. disregarding the safe and secure use of the holding tanks and choosing instead to utilize the unsafe and unsecure use of the stairwells as "holding areas" for GP inmates) and doing so for ease and/or faster processing of GP inmates through their court hearings have given ease and comfort higher priority than PC inmate Safety and protection, in total and willful, reckless and/or callous disregard for plaintiff's and all PC inmates' need for safety, in violation of federally protected rights, specifically, in violation of the Eighth and the Due Process Clause of the Fourteenth Amendments to the United States Constitution, and such disregard for plaintiffs need for safety was a proximate cause of his serious physical, emotional, and psychological injuries.

264. As a proximate result of defendants County of Sacramentos', Jones', Andris', Cooper's, Martinez's, Place's, kinder's, and Does' 1-5 conduct as alleged herein above, plaintiff has suffered and continues to suffer general damages in the form of emotional and psychological distress, to wit, severe anxiety of which he receives psychiatric care for, in addition to, psychiatric medication to help him cope with such distress.

265. As a further proximate result of defendants County of Sacramentos, Jones', Cooper's, Andris', Martinez's, Place's, kinder's, and Does' 1-5 conduct as alleged hereinabove, plaintiff is informed and believes, and thereon alleges, that he will continue to suffer special damages in the future in the form of medical expenses for psychiatric treatment and medications for his anxiety, and loss of income due to such expenses.

266. All defendants continue to violate plaintiffs and all PC inmates' rights

under the Eighth and the Due Process Clause of the Fourteenth Amendments to
the United States Constitution to be free from deliberate indifference to their
personal need for safety by failing and/or refusing to end their policy, defacto
policy, custom or practice of mixing PC and GP inmates in the stairwells
despite their knowledge of the obvious substantial risk of harm such mixing
thereof poses to plaintiff and all PC inmates.

B. Deliberate Indifference to Plaintiff's Serious Medical Needs

267. Plaintiff refers to and incorporates by reference herein the allegations of
paragraphs 14-67, 78, 106, 111-112, 140-142, 219, inclusive.

268. Plaintiff's medical condition, as described herein, constitutes a serious medical
need in that a doctor (Dr. Nugget) diagnosed his injuries as requiring treatment
stating that plaintiff had a "through and through" (plaintiff's top tooth had punctured
The outer portion of his bottom lip and exited on the inside, hence, a "through and through")
which required sutures to close up and a tetanus vaccine to ward off or prevent
infection and, therefore, The failure and/or delay in treatment of plaintiff's injures
would have resulted in disfigurement of plaintiff's lip and dangerous and
painful infection.

269. The actions of defendant Place in failing to take steps to ensure that plaintiff
received the required medical attention and his telling plaintiff that he did NOT
need medical attention after being informed by plaintiff that he needed to seek
medical attention because he was experiencing pain, could feel lacerations to his mouth
area, and could taste blood, constitutes deliberate indifference to plaintiff's serious
medical needs in violation of the Eighth and the Due Process Clause of the
Fourteenth Amendments to the United States Constitution in that defendant Place's
knowledge of plaintiff having been assaulted, his knowledge of plaintiff experiencing
pain due to plaintiff having informed him of such, in addition to, plaintiff having
requested medical attention and his own examination of plaintiff's injuries, to
which he stated, "NO, you're fine..." put defendant Place on sufficient notice
of plaintiff's serious medical needs. Furthermore, defendant Place's attempt at
keeping plaintiff from seeking medical attention, for the purpose of not having
the assault on plaintiff and his injuries sustained there from formally
acknowledged and documented so as to escape liability further establishes

50

defendant Place's liability as to this claim.

270. The failure of defendants Kinder and Does 1-5 to take steps to ensure that Plaintiff received the required medical attention, despite their knowledge of plaintiff having been assaulted and having sustained injuries therefrom, and having intentionally failed in this regard for the purpose of attempting to keep the assault on plaintiff and the injuries sustained therefrom from becoming formally acknowledged and documented and thereby escaping liability constitutes deliberate indifference to plaintiff's serious medical need, in violation of, the Eighth and the Due Process Clause of the Fourteenth Amendments to the United States Constitution.

C. Conspiracy to Obstruct the Due Course of Justice and Deprive Plaintiff of Equal Protection of the Law

271. Plaintiff refers to and incorporates by reference herein the allegations of paragraphs 30, 38-39, 41, 78-80, 96-98, 102-114, 120, 137-141, 145-148, 151, 169, 221, inclusive.

272. For the sole purpose of attempting to escape liability, defendants Place, Kinder, and Does 1-5 discussed their probable liability in the assault on plaintiff on March 22, 2012, and by agreement all intentionally failed to investigate the assault and agreed not to report it or issue any disciplinary action against inmate Abayta. Lt. Petersen in reviewing and responding to plaintiff's initial grievance and through his own investigation and inquiries of the assault, revealed that the assault had not been reported nor any disciplinary action taken against inmate Abayta and thereafter, but before responding to plaintiff's initial grievance, instructed defendant Place to issue an inmate incident report which he eventually did, and only by Lt. Petersen's instruction, one week after the assault on plaintiff. Having discussed their probable liability and plan to escape such, defendants Place, Kinder, and Does 1-5 conspired to obstruct the due course of justice and deprive plaintiff of equal protection of the law, in violation of, the Equal Protection of the Law Clause of the Fourteenth Amendment to the United States Constitution.

D. Retaliation for Free Speech

51

273. Plaintiff refers to and incorporates by reference herein the allegations of paragraphs 153-189, 220, 225-230, inclusive.

274. The actions of defendant Melvin Oania in subjecting plaintiff to hostility and threat in retaliation for plaintiff continually filing grievances in his efforts to secure adequate protective measures against GP inmate assault and violence constitutes retaliation for free speech, in violation of the First Amendment to the United States Constitution in that defendant Oania's threat to transfer plaintiff to another facility and his promise to do so unless plaintiff wrote him a letter stating he no longer feared for his safety when attending court and ceased to grieving that same issue (the mixing of PC and GP inmates in the stairwells), as such transfer served no remedial purpose, defendant Oania's conduct toward plaintiff was completely and utterly retaliatory in nature in violation of federally protected rights.

## Negligent Failure to Protect

275. Plaintiff refers to and incorporates by reference herein the allegations of paragraphs 5-22, 53-77, 82-95, 149-217, 223, 225-252, 256-265, inclusive.

276. Defendants County of Sacramento, Jones, Cooper, Andris, Martinez, Place, kinder, and Does 1-5, under California state law, owed plaintiff a duty of reasonable care to protect him from assault by other inmates.

277. Under California state law general negligence principles, a person ordinarily is obligated to exercise due care in his or her own actions so as not to create an unreasonable risk of injury to others. Furthermore, one's general duty to exercise due care includes the duty not to place another person in a situation in which the other person is exposed to an unreasonable risk of harm through the reasonably foreseeable conduct of a third person.

278. When the state or county governments have taken a person into custody and have deprived the person of the ability to care for himself, the state or county government must then provide for basic needs, including reasonable safety.

279. Defendants County of Sacramento, Jones, Cooper, Andris, Martinez, Place, kinder,

52

and Does 1-5 breached their duty and plaintiff by failing to provide him, as a protective custody inmate, with protection in that they willfully chose to disregard all protective measures established by defendant County of Sacramento and the SSD, including PC and GP inmate segregation policies, the safe and secure use of the Court holding tanks, and providing PC inmates with a deputy escort, and instead chose to place a GP inmate and known gang-member in an unsafe and unsecure location and thereafter directing plaintiff into same location where he was violently assaulted and received serious physical, emotional, and psychological injuries.

280. Defendants County of Sacramento's, Jone's, Cooper's, Andris', Martinez's, Place's, Kinder's, and Does' 1-5 breach of duty was a proximate cause of plaintiff's injuries.

## General Negligence

281. Plaintiff refers to and incorporates by reference herein the allegations of paragraphs 5-22, 53-77, 82-95, 149-217, 223, 225-265, inclusive.

282. Defendant County of Sacramento owes its citizens a duty not to maintain public premises in a dangerous condition and, specifically, not to maintain its premises in a condition that will increase the reasonably foreseeable risk that criminal activity will injure such individuals.

283. Defendant County of Sacramento breached that duty by negligently creating a dangerous condition and by negligently misusing county and/or public property in that defendant County of Sacramento and its agents, defendants Jones', Cooper, Andris, Martinez, Place, Kinder and Does 1-5 affirmatively chose to utilize the stairwells of the main jail as "holding areas" for GP inmates while awaiting their court hearings and did so despite their knowledge of the obvious risks to inmate safety and despite their knowledge of the alternative safe and secure use of the holding tanks for which they were designed and constructed for.

284. Such negligence by defendant County of Sacramento and its breach of duty was a proximate cause of plaintiff's serious physical, emotional and psychological injuries.

## Relief Requested

WHEREFORE, plaintiff requests that the Court grant the following relief:

53

A. Issue a declaratory judgment stating that:

1. Defendants County of Sacramento, Jones, Cooper, Andris, Martinez, Place, Kinder, and Does 1-5 violated plaintiff's rights under the Eighth and the Due Process Clause of the Fourteenth Amendments to the United States Constitution to be free from deliberate indifference to his need for safety by creating and/or utilizing a policy, de facto policy, custom or practice which resulted in plaintiff being violently assaulted and proximately caused his serious physical, emotional, and psychological injuries.

2. Defendants County of Sacramento, Jones, Cooper, Andris, Martinez, Oania, Place, Kinder, and Does 1-5 continue to be deliberately indifferent to plaintiff's and all PC inmates need for safety in violation of the Eighth and the Due Process Clause of the Fourteenth Amendments to the United States Constitution by failing and refusing to end the hazardous and unsafe mixing of PC and GP inmates in the stairwells, failing to implement adequate measures to ensure plaintiff's and all PC inmates' safety, and failing to enforce their own policies of PC and GP inmate segregation.

3. Defendant Oania violated plaintiff's First Amendment right under the United States Constitution to be free from retaliation for free speech in filing grievances expressing fear for his safety and challenging the mixing of PC and GP inmates in the stairwells.

4. Defendants Place, Kinder, and Does 1-5 violated plaintiff's rights under the Eighth and the Due Process Clause of the Fourteenth Amendments to the United States Constitution to be free from deliberate indifference to his serious medical needs.

5. Defendants Place, Kinder, and Does 1-5 violated plaintiff's rights under the Equal Protection of the Law Clause of the Fourteenth Amendment to the United States Constitution by conspiring to obstruct the due course of justice and thereby depriving plaintiff of equal protection

6. The failure of all defendants, except defendant Oania, to provide their duty of reasonable care to protect plaintiff, a PC inmate, from assault by a GP inmate constitutes the tort of negligence under California State Law.

7. Defendant County of Sacramento and its agents, defendants Jones, Cooper, Andris, Martinez, Place, Kinder, and Does 1-5, negligently created a dangerous condition of and negligently misused County and/or public property which was a proximate cause of plaintiff's serious physical, emotional, and psychological injuries and such actions constitute the tort of negligence under California state law.

8. Plaintiff would have suffered much more grievous physical injuries and narrowly escaped doing so due to the fortunate intervention of the PC inmate who was behind plaintiff and who literally caught plaintiff and halted his backwards fall down the stairwell after being violently assaulted by inmate Aboytes.

9. All defendants continue to negligently create a dangerous condition of and continue to misuse County and/or public property by continuing to utilize the stairwells of the main jail as "holding areas" for GP inmates while awaiting their court hearings.

B. Issue an injunction ordering defendants County of Sacramento, Jones, Cooper, and Andris to:
1. Immediately change their policy and/or halt the usage of their custom or practice of utilizing the stairwells of the main jail as "holding areas" for GP inmates awaiting their court hearings.

2. Immediately change their policy and/or halt their usage of their custom or practice of mixing PC and GP inmates in the stairwells of the main jail.

3. Enforce their own policies of PC and GP inmate segregation.

C. Award compensatory damages in the following amounts:
1. $150,000 jointly and severally against defendants County of Sacramento, Jones, Cooper, Andris, Martinez, Place, Kinder, and Does 1-5 for the serious physical, emotional, and psychological injuries proximately caused by the actions of these defendants in being deliberately indifferent to plaintiff's need for safety.

2. $20,000 jointly and severally against defendants Place, Kinder, and Does 1-5 for the physical and emotional injuries resulting from their actions in being deliberately indifferent to plaintiff's serious medical needs.

3. $10,000 jointly and severally against defendants Plate, Kinder, and Does 1-5 for conspiring to obstruct the due course of justice and depriving plaintiff of equal protection of the law.

4. $5,000 against defendant Oania for retaliating against plaintiff.

5. $10,000 jointly and severally against all defendants for continuously exposing plaintiff to substantial risk of harm when attending court, specifically, on April 12, 2012, and June 8, 2012

D. Award punitive damages in the following amounts:
  1. $5,000 each against defendants Plate, Kinder, and Does 1-5 for conspiring to obstruct the due course of justice and depriving plaintiff with equal protection of the law.

2. $5,000 each against defendants Plate, Kinder, and Does 1-5 for acting with deliberate indifference to plaintiff's serious medical needs.

3. $10,000 against defendant Oania for retaliating against plaintiff.

E. Award compensatory damages in following amounts:
  1. $25,000 jointly and severally against defendants County of Sacramento, Jones, Cooper, Andris, Martinez, Plate, Kinder, and Does 1-5 for their negligent failure to provide plaintiff with their duty of reasonable care to protect him from assault by other inmates and for their negligent creation of a dangerous condition of and negligent misuse of County and/or public property, in accordance with California state law.

F. Grant such other relief as it may appear plaintiff is entitled.

Pursuant to 28 U.S.C § 1746, I declare under penalty of perjury that the foregoing is true and correct.
Date: December 26, 2012

Respectfully submitted,

Carlos R. Aguirre
X-3001245 (4e-214)
651 I Street
Sacramento, CA 95814

Signed,

Carlos R. Aguirre
Plaintiff

56